CITY OF POLYTECHNIC v. REDMON et al.
(No. 9003.)

(Court of Civil Appeals of Texas. Ft. Worth. Nov. 1, 1919. On Motion for Rehearing, Dec. 20, 1919.)

1. INDEMNITY ⬤═➤9(1)—STREET RAILWAY INDEMNITOR LIABLE TO CITY FOR PERSONAL INJURIES ON STREET.

Where a traction company in constructing a street railroad through a city employed drivers to haul gravel, one of whom drove over a culvert, crushing it, whereby a pedestrian fell therein and was injured, the traction company was bound to save the city harmless from the resulting damages under a provision of the franchise that such company should hold the city "harmless for any damages to property or injuries to persons which may arise by reason of the construction" of the railroad.

2. INDEMNITY ⬤═➤15(6) — CITY'S ANSWER IN PERSONAL INJURY ACTION SUFFICIENT TO AUTHORIZE JUDGMENT OVER AGAINST TRACTION COMPANY AS INDEMNITOR.

Where a pedestrian was injured by falling into a culvert crushed by a wagon used by a street railroad company in hauling dirt during the construction of its road under a franchise saving the city harmless for damages resulting from such construction, an answer by the city, setting out the franchise and alleging that the active wrongdoer was the traction company, and that the city's negligence, if any, was passive, that the construction company was obligated to construct its road with as little inconvenience to the public as possible to save the city harmless of damages, held sufficient to authorize a judgment over against the traction company.

3. MASTER AND SERVANT ⬤═➤317 — STREET RAILWAY INDEMNITOR LIABLE FOR INJURIES BY INDEPENDENT CONTRACTOR.

Where a pedestrian was injured by falling into a culvert crushed by a wagon used in hauling gravel for the construction of a street railroad under a franchise saving the city "harmless for any damages to property or injuries to persons which may arise by reason of the construction," such franchise imposed a liability on the traction company, even though the driver of the wagon was an independent contractor.

4. INDEMNITY ⬤═➤9(1)—CONSEQUENCES OF PASSIVE NEGLIGENCE OF CITY INCLUDED IN TRACTION COMPANY'S CONTRACT.

Where a street railroad franchise provided that the traction company should hold the city "harmless for any damages to property or injuries to persons which may arise by reason of the construction" of the railroad, the traction company was liable to the city for a judgment against the city in favor of a pedestrian injured by city's passive neglect to repair a culvert, crushed by a wagon used by traction company in hauling gravel for the construction of the road.

5. NEW TRIAL ⬤═➤102(1)—NEWLY DISCOVERED EVIDENCE CONSTITUTES NO GROUND WHERE DUE DILIGENCE HAS NOT BEEN EXERCISED.

In a pedestrian's action for personal injuries, due to falling into a culvert crushed by a wagon used for the construction of a street railroad, where it was a question whether such destruction was caused by the servants of the traction company, it was not error to refuse a new trial for newly discovered evidence, where the suit had been pending for nearly two years, and the city, which was made a party defendant, had made no effort to have the witnesses testify, although their residence was known.

6. NEW TRIAL ⬤═➤104(1)—NEWLY DISCOVERED EVIDENCE CUMULATIVE IN CHARACTER NOT GROUND.

A new trial will rarely be granted in order that a party may avail himself of merely cumulative testimony.

7. DAMAGES ⬤═➤130(3)—$10,000 EXCESSIVE FOR INJURIES TO PEDESTRIAN FALLING INTO A DEFECTIVE CULVERT, CAUSING PREMATURE BIRTH.

Where plaintiff's wife, injured by falling into a defective culvert, was confined in bed, gave premature birth to twins, and was unable to do her customary housework, a verdict of $10,000 was excessive, and will be reduced to $7,500.

Appeal from District Court, Tarrant County; Bruce Young, Judge.

Action by K. C. Redmon against the City of Polytechnic and the Northern Texas Traction Company for personal injuries. Judgment for the Northern Texas Traction Company and Stone & Webster Engineering Company, and for plaintiff against the City, and the City appeals. Reversed and remanded as to all except the Stone & Webster Engineering Company, unless plaintiff file remittitur within 10 days, in which case judgment against the City affirmed, and judgment over against the Northern Texas Traction Company.

Samuels & Brown and James & Conner, all of Ft. Worth, for appellant.

Capps, Cantey, Hanger & Short and David B. Trammell, all of Ft. Worth, for Traction Co.

McLean, Scott & McLean, of Ft. Worth, for appellees.

───────────────────────────────

⬤═➤For other cases see same topic and KEY ·NUMBER in all Key-Numbered Digests and Indexes

CONNER, C. J. Mrs. Beulah Redmon was injured by falling into an open culvert on the night of October 1, 1915, in the city of Polytechnic, and this suit was shortly thereafter instituted by appellee, her husband, for damages, with the result that it was tried and judgment herein rendered in appellee's favor on the 12th day of November, 1917. As instituted the plaintiff complained of the Northern Texas Traction Company, Stone & Webster Engineering Corporation, and the city of Polytechnic, damages being laid in the sum of $50,000. The court instructed a verdict in favor of the Northern Texas Traction Company and in favor of the Stone & Webster Engineering Company. No complaint is made of the action of the court in instructing a verdict for Stone & Webster Engineering Company, and no further reference to that corporation will therefore be made, it being proper at all events that the judgment as to that corporation be left undisturbed; and it will be so ordered. We think we may also, but briefly, notice the plaintiff's allegations of negligence, inasmuch as on this appeal from the judgment a sufficiency of proof to sustain the issues of negligence presented in the plaintiff's petition is not questioned. But, briefly stated, the plaintiff alleged that the defendants were engaged in improving Bishop avenue in the city of Polytechnic, and that during the course of the work the defendants, the city of Polytechnic and the traction company, transported gravel and other material to be used along the traction company's line of street railway; that while doing so a wagon or wagons in which the gravel was being hauled ran over and crushed a certain culvert or small bridge which had been theretofore constructed across a ditch or depression in the earth along the side of the street, and that in so doing the defendants acted negligently, and were negligent in permitting the defect thus occasioned to remain without repair and without warning to traveling pedestrians, in consequence of which, it was alleged that the plaintiff, in attempting to cross the street in the nighttime, and without warning and without knowledge of the damaged condition so produced, fell into the culvert and was seriously injured.

The city of Polytechnic answered by a general denial, a plea of contributory negligence, and further alleged that Bishop avenue extends within the corporate limits of the city of Polytechnic, and that the culvert in question was, in fact, wrecked by the wagon or wagons at the time being used by the traction company and operated by the servants and employés of said defendant, and that, if therefore the city was guilty of any default or negligence in respect to the condition in which said culvert or ditch was left, such default or negligence consisted merely of its failure to discover and remedy the condition caused and brought about by the acts on the part of its said codefendants, their servants and employés, and that such acts on the part of its said codefendants, their servants and employés, were the primary cause of any injuries plaintiff's wife might have suffered, if any.

The city further specially alleged that on or about the 1st day of September, 1911, the defendant traction company applied to it through its duly acting board of commissioners for a franchise to construct, maintain, and operate an electric railway line along Bishop avenue within the corporate limits of said city; that said franchise, for a period of 50 years, was duly granted on the 25th day of September, 1911; that by the terms of the ordinance so providing it was particularly specified that the work of construction and maintaining the said electric line should be done with as little inconvenience to the public as possible, and that the traction company in so constructing and maintaining its said line would hold the city of Polytechnic harmless for any damages to property or injuries to persons that might arise by reason thereof; that if plaintiff's wife was injured by reason of the broken, exposed, and dangerous condition of the culvert or ditch in question, as alleged by the plaintiff, then such injury arose by reason of the construction and maintenance and operation of said railway within the corporate limits of said city, and that hence the defendant the Northern Texas Traction Company, by virtue of its said franchise, which had been duly accepted by said company, became liable and bound to save and hold this defendant (the city) harmless from any and all liability in the premises, and the prayer, on the part of the city, was:

"That plaintiff take nothing by his suit, and that it go hence without day and with its costs; and, in the alternative, this defendant prays that, in the event that plaintiff recover against it in any sum, then that it have judgment in like sum over against its codefendant, * * * the Northern Texas Traction Company."

The traction company, in addition to a general denial, pleaded to the effect that it had nothing to do with the hauling of any gravel or other material which was being used in the work on this defendant's track; that this defendant had made a contract with one R. C. Allen to haul certain gravel to be used along and about its track, and that the hauling of such gravel was accomplished by said Allen and other persons employed by him, but that this defendant had no control over the hauling of the same, and no direction or supervision about or concerning the same, and no right to direct how the same should be done, and was only interested in the result accomplished, to wit, the delivery to it of certain gravel for which it had con-

tracted to pay said Allen a definite and specific sum per square yard, at a definite and specific place; that if the structure and culvert described in plaintiff's petition was broken down, it was not done by any one in the employment of this defendant, or over whose actions this defendant had any control, and that this defendant was in no way or manner responsible for the same; that the said R. C. Allen was in the premises and at the time and place referred to, an independent contractor, for whose acts and the acts of those under him, this defendant was in no way or manner responsible.

The court, as stated, instructed a verdict in favor of the defendant traction company, and upon a trial of the issues presented in plaintiff's petition, the jury rendered a verdict in favor of the plaintiff against the city of Polytechnic for the sum of $20,000. Upon the city's motion for a new trial, the court required a remittitur of $10,000 and entered final judgment against the city in favor of appellee for a sum in like amount, and the city has appealed.

The appellant's first assignment of error is directed to the action of the court in peremptorily instructing the jury to return a verdict in favor of the Northern Texas Traction Company. The ordinance, under and by virtue of which the traction company was operating on and along Bishop avenue, reads as follows:

"Ordinance No. 26.

"An ordinance granting to the Northern Texas Traction Company, a corporation, its successors and assigns, the right, license and franchise to construct, equip, maintain and operate by electricity or some motive power other than steam a line of street railway along, over and upon and across certain and public grounds in the city of Polytechnic.

"Be it ordained by the board of commissioners of the city of Polytechnic:

"Section 1. That the right, license and franchise is hereby given and granted unto the Northern Texas Traction Company, a corporation, its successors and assigns for the full term of fifty (50) years to construct, equip, maintain, and operate an electric railroad for the carriage of passengers and freight with all necessary single or double track, curves, turnouts, Y's, sidings, switches, connections, frogs, poles, wires and all other fixtures, appurtenances and belongings requisite, necessary or convenient for the construction, operation and maintenance of an electric railroad (or as may hereafter be required by said grantee, its successors and assigns during the life of this franchise) along, through, upon, over and across the following streets, alleys, public grounds and highways in the city of Polytechnic, Tarrant county, Texas, to wit:

"Beginning at the end of the present line of tracks of said grantee, Northern Texas Traction Company, on Avenue F near the intersection of Vaugh street in the city of Polytechnic; thence East on Avenue F to Bishop Street;

thence south on Bishop street to and across Hanger avenue.

"Sec. 2. That said Northern Texas Traction Company, its successors and assigns shall construct its said railroad track or tracks as near the center of the streets as may be, or when such location is not practicable then at such place or places in, along and upon said streets as may be designated by the board of commissioners of said city of Polytechnic or some one acting for them; such track or tracks shall conform to the grades of said streets, said grades to be furnished by the city engineer or other official acting on behalf of the city of Polytechnic that said track or tracks shall be constructed so that the surface thereof will be substantially even with the surface of said streets; that the work of construction of the railroad shall be done with as little convenience to the public as possible; that said streets after the construction of said railroad shall be restored to their original condition as nearly as practicable; that after the construction thereof the space between the rails shall be kept and maintained in the same condition as the remaining portion of said streets, alleys and public grounds and when any part thereof shall be paved by the city of Polytechnic or under its direction then the said Northern Texas Traction Company, its successors and assigns shall in like manner with like material forthwith pave between the rails of said railroad tracks and for eighteen (18) inches on the outside thereof at their own expense.

"Sec. 3. That said Northern Texas Traction Company, its successors and assigns shall hold the city of Polytechnic harmless for any damages to property or injuries to persons which may arise by reason of the construction, maintenance and operation of said railroad within the corporate limits of said city.

"Sec. 4. That this ordinance shall take effect and be in full force and effect from and after its passage."

The acceptance of this franchise is evidenced by the following letter:

"Ft. Worth, Texas, Oct. 9, 1911.

"To the Honorable, the Mayor, and Board of Commissioners of the City of Polytechnic, Texas—Gentlemen:

"The Northern Texas Traction Company accepts and takes this means of expressing its acceptance of the right, privileges and franchises granted to it by the board of commissioners of the city of Polytechnic as set out and expressed in the ordinance adopted by that body on the 26th day of September, 1911, and the same being now enrolled and recorded in the ordinance books of the city of Polytechnic as Ordinance Number 2.

"And the said Northern Texas Traction Company hereby agrees that it will be bound by and observe and carry out the terms, conditions and provisions in said ordinance contained.

"Respectfully,
"Northern Texas Traction Company,
"By G. H. Clifford, Vice President."

We are of the opinion that the court erred in peremptorily instructing for the traction company. The evidence, as given by the

general superintendent of the traction company, is to the effect that the city of Polytechnic had ordered the street car company to gravel the entire length of Bishop avenue, over which the street car line was being operated; that the company was to gravel that part of the street occupied by the car tracks and 18 inches on each side; that in doing the work on the track, the company made a contract with a man by the name of Allen to furnish the gravel on the tracks which was put under the tracks and between the rails, and for 18 inches on each side; that Allen was to furnish the gravel for 64 cents a yard delivered on the tracks, and that the force of the traction company thereupon was to spread the gravel and to tamp it under the ties and rails as directed.

The evidence further shows, without dispute, that in the progress of the work it became necessary to excavate and remove dirt from between the ties, which was removed by the wagons hauling the gravel. Mr. Berry, the general superintendent of the traction company, in his testimony thus described this part of the work:

"We dug out between the rails practically the entire distance," so it would not mix with the gravel; the track was built originally with a gravel foundation and a dirt filling, and our franchise required that the tracks should be paved with the same material as the rest of the street, and as it was originally built it provided for a gravel surface, and when this talk came up we had to dig out the dirt filling in between the rails and on top of the ties to provide gravel surface. In doing this work, we dug out the dirt between the ties and rails and filled it with gravel. As the wagons drove up there with gravel, it was practically all dumped in the middle of the track but there was some dumped outside, because we put 18 inches outside of the rails; the agreement was that it was to be dumped on our track and that meant 18 inches from each rail. I don't think there was any dumped in the street and shoveled over; there would have been no occasion for that, because we had done our excavating and taken out the dirt before we dumped the gravel. The dirt that we excavated was hauled away; it was immediately shoveled into the wagons.

"J. B. Allen is the man we paid for the gravel. I am not sure who was hauling this dirt off that we dug out from between the ties. We had no teams of our own, and we employed some one to haul away the dirt, but I am not sure who did it. We did not arrange to dispose of the dirt; it was hauled away by the wagons for so much a load, and it was sold, or whatever was done with it was up to the man that hauled it away; we did not sell any of it. If I remember correctly, we paid 20 cents a yard for having it loaded into the wagons and hauled away. I am not sure of that, but that is the price we generally paid."

[1] Without quoting further testimony, we think it may be said with entire accuracy that the evidence as a whole shows, without dispute, that the dirt from between the ties and under the track that was excavated in the work under consideration for the purpose of replacing the same with gravel was removed and hauled away by the servants and employés operating the gravel wagons. The testimony on the whole further shows, we think, without dispute, that the culvert in question was run over and destroyed by the driver of one of the wagons used in hauling gravel and dirt for the traction company and under such circumstances we conclude that by the very terms of the ordinance franchise, under which the traction company was operating and improving its lines, and by the terms of acceptance thereof, the traction company was bound to save the city of Polytechnic harmless from the damages resulting.

[2] The traction company urges a number of reasons why this cannot be so. It is first insisted that appellant's cross-action, as it is termed, is not sufficiently pleaded to authorize a judgment over against the traction company, but we fail to see, after careful scrutiny of the pleading, of which we have attempted to give a faithful outline, wherein the pleading is deficient. The terms of the accepted franchise are fully set out; and, while the city denied the wrongs charged by the plaintiff in the suit, the allegations were distinct that the active wrongdoer was the defendant traction company; that the negligence of the city, if any, was but passive; that under the terms of the franchise as accepted the traction company was obligated to construct and maintain its road with as little inconvenience to the public as possible, and to save the city harmless for any damage or injuries to persons which might arise by reason of such construction or maintenance and operation of the road within the corporate limits.

It is next insisted that the appellee traction company is not liable either to the plaintiff or to the appellant, since the defect in the culvert which occasioned Mrs. Redmon's injuries was caused by the act of an independent contractor, but we have also been unable to adopt this theory of the facts. In the first place, it is not entirely clear, we think, that the operatives of the wagons which caused the defect under consideration were the servants and employés of a subcontractor. It is true that Mr. Berry, the superintendent, testified that Mr. Allen had been employed to furnish the gravel required for the improvement of the street at so much per cubic yard, but he also testified, as already noted, that in making the improvement it became necessary to remove from between the ties and other places certain dirt, and this was removed by the wagons which hauled the gravel. To reiterate, he says:

"I am not sure who was hauling this dirt off that was between the ties; we had no teams of our own, and we employed some one to haul away the dirt," etc.

[3] If the traction company "employed" those who hauled away the dirt, it may be argued that such persons, in at least a limited sense, were servants and employés of the traction company, for whose wrongful acts or negligence the traction company would be responsible under general principles of law. But regardless of this suggestion, we think the terms of the franchise contract are sufficiently broad to impose the liability sought by the city in this instance, even though Allen is to be regarded simply and only as a subcontractor, and the drivers of wagons, which caused the defect, as employés and servants alone of Allen. It is not disputed that the work in which the traction company was engaged at the time was the work required under the terms of the franchise. The company was therein distinctly obligated to perform all work necessary in the construction or in the maintenance of its line of railway with "as little inconvenience to the public as possible, * * * and to hold the city of Polytechnic harmless for any damage to property or injuries to persons which may arise by reason of the construction, maintenance, and operation of the said railroad within the corporate limits of said city."

The evidence, without dispute, shows that the line of the traction company's railroad was in the center of the street and that it was improving the same for eighteen inches on either side. The evidence further shows, without dispute, that the culvert in question was across the ditch along the eastern side of Bishop avenue, and that the wagons which hauled the gravel to and the dirt from the car track in turning the corner of a street which crossed Bishop avenue at right angles and on into Bishop avenue to deposit the gravel are the wagons which crushed the culvert. Assuming that Bishop avenue is of the ordinary width, as one of the witnesses described it, not many feet intervened between the ditch and culvert and the end of the traction company's ties, and it was within easy contemplation that the drivers, in making the necessary turns, might do the very thing that was done. In all events, as it seems to us, the destruction of the culvert arose "by reason" of the traction company's construction and maintenance of its line of railway. The term, "may arise by reason of," as used in the franchise contract, properly interpreted, comprehends, we think, any damage which is occasioned in any necessary work of construction or maintenance which may be undertaken by the traction company, and certainly the operations of the traction company at the time gave rise to and furnished the occasion for the injury done to the culvert, and resulted in an inconvenience and injury to a member of the public.

In the cause of G., C. & S. F. Ry. Co. v. Chenault, 31 Tex. Civ. App. 558, 72 S. W. 868, it appears that Chenault sued the railway company for damages on account of a nuisance. The facts were that a cattle train on defendant's road had been wrecked, killing 18 head of cattle. The defendant's roadmaster contracted with a butcher to remove the cattle some 2 or 3 miles distant. The butcher was to receive the hides for removing the cattle. He moved them, however, near enough to the plaintiff's premises as to create a nuisance. Upon notification to the defendant's agent, the roadmaster came, and as soon as he could secure men had the cattle burned. In the suit by plaintiff to recover damages, the railway company interposed, as here, the defense that the nuisance or wrong was the act of an independent contractor. The court, however, held that it was immaterial in what capacity the butcher acted, whether as independent contractor or as agent or servant of appellant; that it was due the public by appellant to dispose of the carcasses so as to prevent a nuisance, and that this duty could not be delegated to some one else, and the railway company thereby escape liability.

In the case of Eberson v. Continental Inv. Co., 118 Mo. App. 67, 93 S. W. 297, by the St. Louis Court of Appeals, it is held that where a lease provided that in the event of the partial destruction of the building the landlord would as speedily as possible restore them to a condition similar to and equally as good as on the day preceding such partial destruction, such covenant to repair was personal, so that the landlord could not delegate its performance to a contractor and absolve himself from liability for the contractor's negligence in making necessary repairs. In the case of Railway Co. v. Meador, 50 Tex. 77, it was held by our Supreme Court that a railway could not escape liability for the nonperformance of a statutory duty on the ground that the wrong done was by an independent contractor. The same principle, as it seems to us, runs through all of these cases. If the duty is one imposed by contract or by law, then it cannot be delegated to another in such a way as to escape liability for the misfeasances of the person who has undertaken to perform the delegated duty. In the case now before us, as we think, the traction company distinctly undertook the duty of so constructing and maintaining its street railway as not to operate to the inconvenience of the citizens who might have occasion to use its streets, and distinctly undertook to save the city harmless for any damage or injuries to persons that might arise by reason of the performance of such duty. We

do not think that the traction company can absolve itself from liability for the nonperformance of such contractual duty on the ground that the actual wrongdoer was a subcontractor.

The appellee traction company further insists that, regardless of the contract, it is not liable on the ground that the city itself was negligent in failing to remedy the defect and permitting the same to exist for an unreasonable length of time, thus becoming joint tort-feasor. This contention, also, we think must be overruled.

[4] In the court's charge, it was, in effect, assumed that the act of crushing the culvert over the ditch created a dangerous condition and constituted negligence, and the issue submitted to the jury was whether the city was negligent in permitting the defect to remain for such length of time as to constitute negligence. No exception was taken to this charge by any of the parties to the suit, nor, as before stated, is it denied in the briefs that the act of the driver in crushing the bridge was wrongful and created a dangerous condition. So we must assume, we think, that such was the case, and that the city was negligent in the respect alleged. It is to be observed, however, that the wrong or negligence of the drivers of the wagons was active, and that of the city but passive, a mere omission, and if the driver of the wagon was an employé of the traction company, then both it and the city were liable to the plaintiff. In such cases, contrary to the general rule invoked by the traction company, the passive wrongdoer can recover over against the active, even though as against the plaintiff both are liable. See City of Weatherford v. Veit, 196 S. W. 986, and authorities therein cited. But, regardless of the suggestion just made, we are of the opinion that the terms of the contract are such as to include the consequences of the passive negligence of the city. As several times observed, the contract is specific to the effect that the city shall be held harmless for injuries to persons which may arise by reason of the construction and maintenance of the railway. This section of the charter contract contains no limitation, and necessarily implies that cases may arise in which the city will become liable for damages because of injuries to persons or to property caused by the operatives of the car company. Such liability of the city could only arise because of some passive act of negligence on the part of the city. The provision, therefore, distinctly contemplates that the traction company shall indemnify the city in any such case. We conclude that the traction company is liable to the city of Polytechnic for whatever judgment may be lawfully rendered against the city, occasioned by the acts complained of by the plaintiff in the suit.

[5] We are thus brought to the assignments of error which relate to the appellee K. C. Redmon, plaintiff below. But two attacks are made on the judgment in favor of the plaintiff, K. C. Redmon. The first is that the judgment, as finally entered, is excessive, and the second is that it should be set aside on the ground of newly discovered evidence. The latter contention may be briefly disposed of. It is urged that the judgment should be set aside and a new trial granted as prayed for on motion for new trial in the court below, in order to obtain the testimony of R. C. Allen, the alleged subcontractor, and Guy Wagoner, who was driving the wagon which broke down the culvert in question. While the evidence sought, as disclosed by the affidavits of the witness, would probably strengthen the city's allegations to the effect that the destruction of the culvert was the act of the servants and employés of the traction company, yet, we think it quite clear that the city did not exercise due diligence in the effort to ascertain what these witnesses would testify. The suit had been pending nearly two years before the trial, and it does not appear that the city through its counsel made any effort to have the witnesses subpœnaed, although both lived within the city limits of Ft. Worth. In explanation of this, the affidavit of the representative of the city was to the effect that the claim agent of the traction company had assured him that the evidence of Allen would be strongly against the city, but the plaintiff in the suit was in no sense chargeable with such misinformation, and ought not to be penalized because of it.

[6] Moreover, the testimony sought is not, we think, very materially different from the effect of the evidence as we have already given it, and a new trial will rarely be given in order that a party may avail himself of merely cumulative testimony. We accordingly, overruled the assignment complaining of the court's action in overruling the motion for a new trial on the ground of newly discovered evidence.

[7] We are of the opinion, however, that the judgment in appellee's favor for $10,000 is yet excessive, as urged by appellant. In our judgment, the sum of $7,500 will fairly and sufficiently compensate appellee for the injuries to his wife, attributable alone to the wrongs of the defendant. Mrs. Redmon, after testifying to the time and manner of her fall and injury, further testified to the effect that after her fall she got up and returned home and felt very badly, but thought that she would soon be all right, not thinking at the time that it was anything serious, but that she continued to feel worse, complaining of a hurting in her back, and called a Dr. Allen, who directed her to remain in bed. Monday morning after the Saturday

night upon which the fall occurred, she gave birth to twin babies, who lived until about 10 o'clock the Tuesday following. She remained in bed several weeks after the birth of her children, having a trained nurse. She testified:

"I was very sick and suffered a great deal; I don't know just exactly how long. I don't remember just exactly how long I was in bed, but it was several weeks, and it was a long time before I could even do any of my work at all, and I am now—I am not even so I can do any sweeping or anything like that. If I ever make a bad step or anything like that—step off the steps or get in a hurry, why sometimes it lays me up in bed for quite a while, for a week maybe. I have to be careful about how I step and get around. My main trouble is in my back, and I have hernia in my side, and when I am on my feet any length of time, why that troubles me quite a good deal. That is never easy. It hurts me all the time, and I have to wear a large support all the time. I am not even allowed to go without it—not even allowed to lay down at night without it; I have to wear it all the time.

"I have always done my own work; I was a woman that did everything of the kind that I wanted to, and anybody in the neighborhood of where I have ever lived can tell you how I have always worked and always done my own washing and everything, up until this time, and I have never been able to do anything of the kind any more; just at times, I can do a little housework. At times the pains are real severe; at times—now all the time, it is just a dull aching pain; I am never clear of it at times, and at times it is so severe that it makes me sick that I cannot be up at all. It makes me nauseated and then it affects me—I don't know —I had a spell awhile back, the doctor said was caused by it, and I was real bad off, and it was all from that place, and it is never easy; I am never at all; I suffer all the time."

This testimony would, of itself, perhaps, justify the judgment, but we cannot ignore other evidence on the subject which renders certain omissions in appellant's testimony significant. For instance, Cora Smith, a near neighbor, testified that she knew Mrs. Redmon well before and at the time when she was hurt; that after receiving the injury Mrs. Redmon was able to talk; that she took her children and went on back home; that the injury occurred about 7 o'clock on a dark night; that she recalled seeing her on Tuesday morning at her house, when she was sick in bed; that her condition was still worse after Tuesday; that there were two babies born that afternoon; that they were premature children; that she continued to visit Mrs. Redmon after this time, but could not say how long after this time she was confined to her bed; that Mrs. Redmon told her about her accident on the night she received it, but the witness did not see any bruises on her that night and don't remember whether she limped then or not.

Mrs. Jennie Melugin testified to the effect that she was a neighbor of Mrs. Redmon, living just east of her; that their houses were very close together; that Mrs. Redmon and the witness were friendly and they occasionally visited, although they generally saw one another more frequently as they were attending to their household duties; that she recalled the time when Mrs. Redmon gave birth to two premature children; that she had been living next door to Mrs. Redmon ever since, and for something like a year before that time. The following question was asked this witness, and the following answer given:

"Q. Do you know whether or not Mrs. Redmon has been doing her own work during the last year? A. Yes, sir; she managed around like most anybody would do that felt that they couldn't get help all the time, and does her little work, all except her little washing and ironing; she doesn't do that, and she didn't do that before, but she gets around, except now and then she has this same old colored woman that helps her out when she is not feeling well; I could not tell you how often that occurs. Prior to the time of the injury, she would occasionally have her help on Saturday, when she was going to have company or visitors coming in, and all like that, she would have her come and help her out and get her house all ready and things like that. I have known of her doing that once in awhile prior to the time of her sickness, but I don't know how often. I know this woman has come there and helped her out in her housework, when I suppose she was not feeling well. * * *

"I don't think Mrs. Redmon looks as she did before her injury, but still, I could not tell you. Of course she has her little sick spells and the like of that, and she gets down and looks pretty weak and all, but then she gets up and goes again, just like most any industrious woman do; I think Mrs. Redmon is a very energetic woman."

Mrs. D. McRea testified that she lived about one block from Mrs. Redmon, and was friendly with her and saw her sometimes every day and sometimes not for a week; that during the month prior to the occasion in question she discussed with Mrs. Redmon her condition. The witness further said:

"I knew she was pregnant, or thought so; she had other troubles. Along about that time she did not have a cook or colored servant in her house that I know of, but she had help that come to her house; she had a woman to do her washing, and she would come and help her clean up. * * *

"I have visited Mrs. Redmon frequently since the time these children were born. Mrs. Redmon has always had her rough work done, I think, and she has not had any more help since the time those children were born than she had before that I know of."

These witnesses were all called by the plaintiff, and no other testimony on the subject was offered.

It is to be noted that none of plaintiff's neighbors, called to testify, indicated that they had observed any marked or long-continued change in Mrs. Redmon's ability and

habit of doing her work. It is to be noted, also, that Mrs. McRea testified that Mrs. Redmon had "other troubles." This statement was left uncontradicted and unexplained. The husband was not called to testify, though he, perhaps, knew better than any one besides .Mrs. Redmon herself whether she was able to perform her household duties and cares. Nor was either of the two physicians, that the evidence shows attended Mrs. Redmon, called as a witness. It would seem that the physicians were associated with Mrs. Redmon's troubles as to have been able to give disinterested professional information on the subject. In this connection, we must take into consideration the fact that no testimony was offered to show that appellee's fall and injury caused the premature birth and death of her children; at least the court so instructed the jury, and directed that such premature birth and early death was to be wholly disregarded in the jury's consideration of the case, and neither appellee has presented an objection to the charge. The jury, therefore, had no right to consider this circumstance, nor have we. The evidence also shows that on a previous occasion Mrs. Redmon had given birth to a premature child, so that on the whole it is not very clear as to just what extent Mrs. Redmon's debilitated condition is attributable alone to the fall and injury she received at the broken culvert.

We, accordingly, conclude that appellant's assignment directed to the excessive judgment should be sustained, and for the error of the court in entering the amount of $10,-000, the judgment will be reversed, and the cause remanded as to all parties except the Stone & Webster Engineering Company, unless appellee Redmon shall, within ten days from the date of filing this opinion, enter a remittitur in the sum of $2,500, in which event, however, the judgment will then be affirmed for the said sum of $7,500, and in that event it will also be ordered that judgment in like amount be rendered in favor of the appellant city of Polytechnic over and against the appellee the Northern Texas Traction Company. See Elliott on Contracts, § 4012; City of Weatherford Water, Light & Ice v. Veit, supra.

#### On Motion for Rehearing.

After again considering the record herein we find no reason to disturb the conclusions announced in our original opinion. The motion for rehearing will accordingly be overruled without any general discussion. In view, however, of the insistence made that the evidence is conflicting on the question of whose wagon ran over and broke the culvert involved, and that hence we should reverse the cause for a determination of that issue of fact, it may not be improper to add that we have again carefully examined the testimony, and it but strengthens our original conclu-

sion that the evidence was without dispute that the bridge or culvert was broken by the driver of one of the wagons employed in hauling gravel and dirt for the traction company. It is true it is not so stated in direct terms, except in the affidavits of B. J. Allen and E. G. Wagoner attached to the defendant city's motion for a new trial on the ground of newly discovered evidence. But the witness Glen Smith testified that he saw one of the "dump" wagons run over the culvert. Others testified that the city at no time had in use any "dump" wagons. The accident in question was shown to have happened without dispute on the night of October 1st. The witnesses living east of the car track all testified that at the time and prior to the accident the improvement at the place of the accident was and had been going on for some time; and that the wagons engaged in the improvement came from the east, hauling the gravel; that it was the gravel wagons that ran over the culvert. It was further shown by the witness Essex that the city did not begin its improvement until about the 11th day of October, and by other witnesses it was shown that the city's wagons loaded with gravel came from the west, and its work was done several blocks behind that of the traction company. In view of the whole, therefore, it would seem idle to reverse the case for the determination of the issue suggested.

Motion for rehearing overruled.